In the Matter of the GUARDIANSHIP
AND CONSERVATORSHIP OF
Joseph Edmund REED, A Minor.

Gerry SMITH and Roberta Smith, Co–
Conservator and Co–Guardian, Respec-
tively, of Joseph Edmund Reed, Appel-
lants,

v.

Edmund R. REED and Janice Reed, Co–
Conservator and Co–Guardian, Respec-
tively, of Joseph Edmund Reed, Appel-
lees,

v.

Rod SURBER and Rae Ann Surber,
Co–Guardians of Joseph Edmund
Reed, Appellees.

No. 89–568.

Supreme Court of Iowa.

April 17, 1991.

Thomas W. Walter and David J. Hester of Johnson, Hester & Walter, Ottumwa, for appellants.

Paul Goldsmith of Goldsmith Law Office, Chariton, for appellees Surber.

Deborah S. Krauth of Krauth Law Firm, Cherokee, guardian ad litem, for the minor child Joseph Edmund Reed.

Considered by McGIVERIN, C.J., and SCHULTZ, LAVORATO, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

This case raises questions of law and equity arising out of a proceeding for the appointment of a guardian and conservator for a minor child. The child, Joseph Edmund Reed, was orphaned in 1985 at age one by an automobile accident that killed his father and mother. In these proceedings, his maternal grandfather, his paternal grandparents, and his parents' friends have all sought to be appointed guardians and conservators. The district court on remand from the court of appeals placed physical custody with the parents' friends and appointed them coguardians. On a second appeal the court of appeals affirmed. We have granted further review. We now vacate the decision of the court of appeals and reverse the judgment of the district court and remand.

The mother of the minor child, Joseph Reed, was Melody Reed. She was the daughter of Gerry Smith by his first wife from whom he is divorced. He is now married to Roberta Smith. Immediately after his parents' death in 1985, Joseph went to live with the Smiths. They took care of him until the court's decision to change custody in 1988.

At trial time, Gerry was fifty years of age and his wife Roberta was forty-eight. They live on a farm near South English, Iowa, in Keokuk County. Gerry earns a living primarily as a self-employed welder.

Joseph's father was Stephen Reed. His parents are Edmund R. Reed and Janice Reed. They live on a farm that Edmund farms near Keota, Iowa, in Keokuk County. The Reeds' farm is approximately twelve miles from the Smiths' home.

Stephen and Melody Reed were married three years and had farmed with Edmund Reed. The farming venture was not financially successful for Stephen and Melody. They decided to move to Chariton where Stephen worked as a farm employee. Joseph was born while they lived in Chariton. Stephen and Melody joined and were regular attendees at a local church in Chariton where much of their activities centered. For several months preceding their deaths they regularly counseled with their church pastor on personal and religious matters. Their pastor testified that during one or more of these counseling sessions, Stephen and Melody told him that if anything should ever happen to them they did not want either of their parents to raise Joey. It was not that they did not love their parents but they felt that neither of their parents' homes would be the best for Joey. They gave the names of three families in Chariton whom they would choose. Rod and Rae Ann Surber were named first. These preferences were not indicated by wills.

Rod Surber and his wife, Rae Ann, were good friends of the Reeds who visited with each other nearly daily. Joseph, at times, stayed in the Surber home. Rod was editor of the local newspaper; he now lives in

Rochelle, Illinois, where he manages a newspaper staff of four.

In 1986, Stephen decided to go back to school to become a minister. He and Melody traveled to Springfield, Missouri, to arrange for living quarters for themselves while Stephen attended Bible college. On this trip they were killed in an automobile accident. Prior to leaving for Missouri, they left Joseph with a neighbor's babysitter overnight in the Chariton area.

Upon being notified of Stephen and Melody's deaths, Gerry Smith called the Reeds to tell them. He consulted with the Reeds, who agreed that Joseph should be picked up by the Smiths from the babysitter and taken to the Smiths' home. Gerry Smith did this and proceeded to make arrangements for the funerals. He and his wife Roberta then continued to care for Joseph in their home. Several days later, the Smiths and Reeds met at a lawyer's office to discuss Joseph's future. At that meeting, Edmund Reed proposed that Joseph be adopted out. The Smiths rejected this suggestion at the outset.

The case was commenced in January 1987 by the paternal grandfather, Edmund R. Reed, who filed a petition asking that he be appointed conservator of the property of Joseph. On the same date he filed a separate petition asking that he be appointed guardian of Joseph. On February 6, 1987, Gerry Smith, maternal grandfather of Joseph, filed a petition for the appointment of himself and his wife Roberta as coguardians and coconservators of Joseph.

On March 3, 1987, the court ordered all petitions consolidated for the purpose of discovery and trial. Home studies were ordered and discovery was had.

The matter proceeded to trial and covered a period of seven days in March and April 1987. Twenty-six witnesses were heard by the trial court. After trial, Edmund Reed petitioned the court to allow an amendment to conform to the proof adding the name of Janice Reed as a coguardian and coconservator to his petitions. In its initial ruling, the trial court found that under different circumstances either the Smiths or the Reeds would be "qualified and suitable" to serve as guardians and conservators of Joseph, including custody. However, the court held that considering their ages and the antagonism between the grandparents, it would not be in Joseph's best interest to be placed in the custody of either of them. The court thereupon gave physical custody to Rod Surber and Rae Ann Surber. Authority for this was presumed by the court to be given by chapter 600A of the Iowa Code which defines "custodian" in termination of parental rights matters. Janice Reed and Roberta Smith were appointed coguardians.

On appeal, the court of appeals concluded that the trial court erred as a matter of law in appointing the Surbers "custodians" and held that physical custody could only be placed with a guardian. A remand was directed for the placement of physical custody of Joey with a guardian. Before the matter could be heard on remand the Surbers filed a petition to be appointed successor guardians of Joseph, later amending it to request appointment as additional coguardians. Edmund and Janice Reed filed a petition joining and supporting the Surbers' petition and requesting that custody of Joseph be granted to the Surbers. The Smiths filed motions to dismiss both petitions. Temporary physical custody was awarded to the Surbers pending hearing of their application and on the remand. The Smiths thereupon made a demand for a jury trial on the Surbers' petition, which the court denied. It held the statute did not allow a jury trial on who should be appointed guardian and the Smiths were not "parties." The trial court found that there was no limitation on the number of coguardians that could be appointed. The court did not specifically consider whether there was a need for the appointment of additional coguardians but nevertheless appointed the Surbers as additional coguardians and gave physical custody to them. The trial court again declined to place physical custody with either the Smiths or the Reeds, finding that the situation had not changed between the Smiths and the Reeds and that there was no contact between

them except to settle some insurance matters.

On the second appeal, the court of appeals found by a divided court that the Smiths were not entitled to a jury trial because they had not raised a challenge to the status of Joseph or the necessity for the appointment of a guardian. The court of appeals further held it was not permitted to consider the best interest of Joseph but was reviewing the matter solely on error, using a substantial evidence standard. The court of appeals concluded that the district court's findings and orders were supported by substantial evidence in the record and affirmed the decision appointing the Surbers as guardians and custodians.

■ One question presented at this time is an outgrowth of the decision by the court of appeals on the first appeal. On that appeal, the court of appeals held that Iowa Code chapter 633 does not authorize granting physical custody of a minor child to a custodian who has not been appointed guardian. For this reason, the trial court erred when it placed Joseph in the physical custody of Rod and Rae Ann Surber as "custodians." *Matter of the Guardianship of Reed*, 426 N.W.2d 657 (Iowa App. 1988). The case was remanded for the court's determination of physical custody in a guardian. We agree with the court of appeals' determination of this legal issue.

On remand, the issue of "jury trial" arose. The Surbers petitioned for their appointment as guardians, whereupon the Smiths demanded a jury trial to determine who should be appointed guardian. The trial court denied the jury trial motion and the court of appeals agreed on the second appeal.

The Smiths take their legal basis for a jury trial from Iowa Code section 633.555 (1987). That section states:

All other pleadings and the trial of the cause shall be governed by the Rules of Civil Procedure. The cause shall be tried as a law action, and either party shall be entitled to a jury trial if demand is made therefor as provided by the Rules of Civil Procedure.

An identical provision is found in section 633.569 dealing with the opening of conservatorships.

Also pertinent is section 633.33, which states:

Actions to set aside or contest wills, for the involuntary appointment of guardians and conservators, and for the establishment of contested claims shall be triable in probate as law actions, and all other matters triable in probate shall be tried by the probate court as a proceeding in equity.

We have often noted the familiar principle of statutory construction that "all parts of the enactment should be considered together and undue importance should not be given to any single or isolated portion." *Welp v. Iowa Dep't of Revenue*, 333 N.W.2d 481, 483 (Iowa 1983).

In construing these sections we note that section 633.555 granting a jury trial is followed by a section that states the grounds upon which a guardian can be appointed. Section 633.556 states:

If the allegations of the petition as to the status of the proposed ward and the necessity for the appointment of a guardian are proved, the court may appoint a guardian.

■ This section vests the court with the authority to appoint a guardian. By use of the word "may" rather than "shall" the legislature has made an appointment discretionary with the court even when the allegations of the petition are proved. The language used forestalls the idea that this at-law action includes the selection of a guardian by a jury. The jury decision in the guardianship proceeding may be rendered in deciding if the allegations of the petition as to the status of the proposed ward are proved and whether there is a necessity for the appointment. One statutory ground for appointment of a guardian that could be a jury issue is whether the proposed ward is incapable of making important decisions by reason of mental, physical, or other incapacities. Our past cases have indicated this purpose for the statutory right to a trial by jury. *See*

*Richardson v. Richardson,* 217 Iowa 127, 129, 250 N.W. 897, 898 (1933) (inability to manage and control property is a question for the jury); *Holly v. Holly,* 157 Iowa 584, 587, 138 N.W. 445, 446 (1912) (trial by jury in statute has no reference to the appointment by the judge of a temporary guardian or dissolving the temporary guardianship). If these questions, that are jury matters, are answered affirmatively, the decisional act of appointing a guardian is then made by the court.

This construction is logical and consistent with the legislature's mandate in dissolution-of-marriage cases involving child custody. There the court is charged with determining what custody arrangement is in the best interests of the child. Iowa Code § 598.41. It would be incongruous for the legislature to select the court as the decision maker of child custody in a dissolution-of-marriage case and at the same time allow the selection of the custodial guardian by a jury in a guardianship proceeding.

■ The only appropriate jury questions in the case at bar, as alleged in the petition, concerned whether Joseph's best interests as a minor required the appointment of a guardian. The trial court's prior decision decided this from which there was no appeal. We therefore hold that no error occurred in the trial court's denial of Smiths' request for a jury trial.

The trial court's appointment of the Surbers as coguardians and awarding them physical custody raises additional issues of statutory authority. On remand, the trial court interpreted the court of appeals decision to be nondirective that it appoint either the Smiths or Reeds as custodian of Joseph. It found nothing in the Probate Code prohibiting the appointment of multiple guardians. The trial court acting as "superior guardian," after taking additional evidence, found it was in Joseph's best interests to be placed in the custody of the Surbers upon their being appointed coguardians.

■ The Smiths contest the appointment of the Surbers as coguardians as being contrary to law. They assert that the initial appointment of Roberta Smith and Janice Reed was itself error because our statutory law does not authorize the appointment of multiple guardians. They acknowledge, however, that none of the parties raised this as an issue before the court of appeals and it therefore stands as law of the case. The Smiths say that such is not the case, though, regarding the Surbers, since the issue was raised in the Smiths' motion to strike and answer to the Surbers' petition to be appointed coguardians.

There is no statute specifically authorizing the appointment of multiple guardians but we can gather import from other statutes and our own cases. Section 633.4 applies to the entire Probate Code which includes those statutes governing the establishing of guardianships. That section states:

> When used in this Code, unless otherwise required by the context, the masculine gender includes the feminine and the neuter; the singular number includes the plural and the plural number includes the singular.

Section 633.3(17) defines "fiduciary" to include "personal representative, executor, administrator, guardian, conservator and trustee." Section 633.76 refers to the situation "where there are two or more fiduciaries." In section 633.559 the legislature makes a plural reference stating, "[t]he parents of a minor, or either of them, if qualified and suitable, shall be preferred over all others for appointment as guardian." A similar plural reference is made in section 633.571 in preference of parents for appointment as conservator. Section 633.-33 speaks of the involuntary appointment of guardians and conservators. Sections 633.633 and 633.634 also refer to guardians and conservators.

Our cases show that we have often approved the appointment of more than one guardian of the person. For example, in *In re R.G.,* 450 N.W.2d 823 (Iowa 1990), we affirmed the action of a juvenile court referee in appointing M.H. and L.H. guardians and custodians of a child. We said in *In re Guardianship of Lehr,* 249 Iowa 625, 630,

87 N.W.2d 909, 912 (1958), "if both parents are deceased, as in this case, the grandparents are the natural guardians." In *In re Guardianship of Plucar*, 247 Iowa 394, 72 N.W.2d 455 (1955), we ordered the appointment of maternal grandparents of an eight-year-old girl as guardians of the person and property. *See also Holmes v. Derrig*, 127 Iowa 625, 103 N.W. 973 (1905) (custody given to the paternal grandparents of a minor whose parents were deceased); *Thompson v. Collins*, 391 N.W.2d 267 (Iowa App.1986) (custody given to the minor's maternal grandparents). Accordingly, we hold that under section 633.556 the court is authorized to appoint more than one guardian of a proposed ward.

In the present case, we now have four duly appointed guardians. Although not prohibited by statute, we nevertheless have presented to us a question of other legal error having occurred in the court's ruling. We have held that our review of the appointment of a guardian for a minor under sections 633.33 and 633.555 is on error, being an action at law. *In re Guardianship of Murphy*, 397 N.W.2d 686, 688 (Iowa 1986). In this type of review, we will affirm if there is any substantial evidence to support the trial court's findings. *See* Iowa R.App.P. 4. Our review of the evidence necessarily includes a consideration of the underlying basis for these appointments, that this result is in the best interests of the child.

We are given a framework from which to consider this question by our cases. Recently, in a custody decision between parents, our court observed:

No matter which parent has custody, Holly is foredoomed to get much of her care and early training from others. Since this is true, we believe the grandparents are to be preferred over the ministrations of strangers.

*In re Marriage of Welbes*, 327 N.W.2d 756, 758 (Iowa 1982).

*In re Benton*, 92 Iowa 202, 60 N.W. 614 (1894), involved the consolidation of funds in a guardianship created after the death of both parents of an infant. The court ordered funds in the hands of an Iowa guardian of property transferred to the paternal grandfather, who had custody of the child in Wisconsin and was guardian of the person and property of the child. In its analysis, the court stated:

After the death of both parents, infants, who take up their residence at the home of the paternal grandparent or next of kin, in another state, will acquire such grandparent's domicile.... "[I]t seems to us that they should, in the event of the death of both parents, be entitled to the custody of their grandchildren, and that the common law rule, that they are guardians by nature, should obtain in this state."

*Id.* at 205–06, 60 N.W. at 615 (citations omitted).

Our court adopted the *Benton* statements in *Holmes v. Derrig*, 127 Iowa 625, 103 N.W. 973 (1905). There, we said:

This court has also approved the rule by which, upon the death of the parents, the grandfather or the grandmother, when next of kin, succeeds to the natural guardianship of the orphaned infant. The responsibility thus imposed implies corresponding rights of which the natural guardian ought not to be deprived by arbitrary methods.

*Id.* at 629, 103 N.W. at 975 (citations omitted). The *Holmes* case involved a custody dispute between an uncle and the maternal grandparents of the deceased parents' minor child. Our court reversed the award of custody to the uncle stating:

From the first months of its life until removed by the order of the trial court its principal home had been with its grandparents. There is no dispute that they have given to this child of their dead daughter the tender love and care which usually mark such sacred relationships.... The grandparents, by virtue of their relationship, their character as natural guardians, and their actual possession and care of the child, stand first in the legal right to its custody—a right which they are not shown to have forfeited by any failure in the performance of the duties and obligations thus assumed.

127 Iowa at 630–31, 103 N.W. at 975 (citations omitted).

The statements made in *Holmes* were quoted with approval in *Lehr*, 249 Iowa 625, 87 N.W.2d 909 (1958). Also quoted was this statement from *Plucar*, 247 Iowa at 405, 72 N.W.2d at 462: "Where both parents die and the child makes its home with its grandparents who act in good faith it acquires the domicile of the grandparents." *Lehr*, 249 Iowa at 631, 87 N.W.2d at 913. *Lehr* involved a habeas corpus petition for custody of a minor brought by the aunt and uncle of the minor against the minor's grandparents. Our court affirmed the trial court's denial of the habeas corpus petition leaving custody with the grandparents.

The trial court's decision appears to have been derived from an effort to select the best person or persons to raise Joseph from among the several applicants. After the first trial, Rod and Rae Ann Surber were chosen. Upon remand from the court of appeals they were again selected with the addition of Roberta Smith and Janice Reed as coguardians. Physical custody was given to the Surbers as guardians which then conformed to the legal requirement that the custodian be a guardian. Roberta Smith and Janice Reed, each living about four hours driving time from the Surbers, are more like surrogate guardians than guardians of the person in any effective custodial sense. Moreover, the prospect of four guardians suggests a danger of being functionally irresponsible.

While commendable in spirit, the result reached may have circumvolved the process to be used in reaching it. There was never a finding that either the Smiths or the Reeds were not suitable to be guardians. Rather, the court focused on why the Surbers were more suitable. In finding many positive attributes in the Surbers, the court cited negative support in finding a continued antagonism between the grandparents Smiths and Reeds and their age was against them. The court also stated that, under different circumstances, the grandparents could well be "qualified and suitable."

We feel that to effectively reject the grandparents on these grounds overemphasizes these factors both as specifically applied to these parties and as a general rule. Their ages in the forties and fifties should not be a sizable obstacle to raising a child, given a willingness to serve. The antagonism does not appear to be in any way vitriolic but stems from differing desires on who should have custody of Joseph. Such differences are understandable and probably not uncommon. Standing alone, if these reasons were sufficient, many grandparents would be automatically and wrongly disqualified.

■ If we were to consider all of the evidence supporting the Surbers' appointment to be on a par with all other evidence, in considering sufficiency of the evidence, we would be giving no weight to the factor of the Smiths' and Reeds' family relationship. In effect, we would be choosing a best caretaker, irrespective of family ties. We believe our past jurisprudence belies this approach and emphasizes the importance of keeping a child within the family whenever possible. Based on these reasons, our analysis leads us to conclude that the apparent rejection of the grandparents as guardians and the appointment of four guardians in lieu thereof is not supported by substantial evidence.

Although our review is on error, the equitable nature of proceedings for the appointment of a guardian remains. The trial court has taken evidence over an extended period in two separate trials. The error in appointing multiple guardians did not deny the full submission of evidence from which to appoint a guardian. That evidence is before us as it was the trial court. In our decision of *Murphy*, 397 N.W.2d 686 (Iowa 1986), we found that the guardians' appointment was supported by substantial evidence and remanded for entry of an appropriate order by the district court. Nothing in *Murphy* suggests that only the district court has jurisdiction to select the guardian. We have recognized that in this field there is some merging of law and equity distinctions.

Where the issue turns upon the best welfare of the child, and involves the overturning of presumptive parental rights in the interest of the child, we have found it difficult to separate questions of law from questions of fact, and have found ourselves unable to adhere very strictly to the rule contended for by appellee. We have necessarily recognized the fact that the determination of such issues carries us into the field of equity, and that it is indispensable that principles of equity be applied.

*Jensen v. Sorenson,* 211 Iowa 354, 367, 233 N.W. 717, 723 (1930).

In *Estate of Osborne,* 363 Pa.Super. 200, 525 A.2d 788 (1987), the appellate court had to determine whether the Orphans' Court Division of the Courts of Common Pleas may direct the Register of Wills to issue letters of administration to an individual selected by the Orphans' Court. Appellant had argued that the power to select an administrator lies within the exclusive jurisdiction of the Register.

In rejecting this assertion, the appellate court said:

According to appellant, however, after revoking the letters, the Orphans' Court must remand the matter to the Register, who will then entertain new applications for letters of administration. Appellant claims that the selection of a proper administrator is within the exclusive jurisdiction of the Register of Wills. Although we agree that the original selection of an administrator is normally a task within the jurisdiction of the Register, we hold that, upon a finding by the Orphans' Court that the Register has abused its discretion in the selection of the original administrator, the Orphans' Court may review the evidence presented, revoke the letters, and direct the Register to issue letters to the individual whom the court finds to be entitled to administer the estate.

. . . .

Following appellant's reasoning, the court, after gathering all the evidence and concluding that the Register erred in its choice of administrator, would have the power only to revoke the letters, and would then be required to remand the matter back to the Register. The Register would then reconsider the application, re-gather the evidence, and choose another administrator. We cannot agree that the legislature would intend such an unreasonable result; such a circular procedure would involve a needless waste of judicial and administrative time and expense. We therefore reject appellant's contention in favor of the more reasonable construction.

■ We believe it would be counterproductive to remand this case for further hearings given the full development of the record and the extra delay that a remand would entail. We therefore consider Joseph's grandparents for appointment as guardian.

Gerry Smith and Roberta Smith live on an acreage near South English, Iowa, in Keokuk County, situated approximately twelve miles from the Edmund and Janice Reed farm. Gerry Smith has farmed in the past and has also had a welding shop business. At trial time, he worked as a welder on construction jobs and when so employed usually stayed at the job site during the week but was home on weekends. He has now obtained other employment that allows him to be at home more frequently. Gerry and his first wife, Bonnie, were married young and had four children. One child died at birth. Bonnie left Gerry and the three young children. Melody was the youngest at eighteen months and her father was twenty-four years old. Gerry obtained a divorce from his wife and raised the three children with help from his mother until he met and married Roberta. They have one son, Robert, now age fourteen. Roberta has two adult children from a prior marriage. Although Roberta did not adopt Gerry's children, she did, along with Gerry, raise them.

Edmund R. Reed and his wife Janice are farmers and live near Keota, Iowa, in Keokuk County. They have raised five children ranging in age from Stephen, who was twenty-four when he died, to Susan, now age twenty-one. One other son, Rich-

ard, also died. The Reeds, in addition to Susan have a son, Scott, age twenty-two, who is single and son Stanley, age twenty-three, who was married but is separated from his wife and has two minor children. Susan is a college student. Scott is a farm employee located in Marion County, Iowa. Stanley farms with his father, Edmund, but does not live in the family home. He has temporary part-time custody of his two minor children for whom his mother Janice babysits during the day while Stanley works.

Both sets of grandparents profess a desire to have custody of Joseph but the Reeds' position comes late. Initially, Edmund Reed thought he and the Smiths were too old and Joseph should be "adopted out." His statements and actions throughout the proceedings were calculated to have the Surbers raise Joseph. He felt that this was for the best and was what Joseph's parents wanted. Although Joseph has not been adopted out, the result is a close cousin.

By contrast, the Smiths have wanted to raise Joseph in their home from the beginning. Whereas Edmund Reed declined to pick up Joseph at the babysitters after his parents died or to make funeral arrangements, Gerry Smith did both. Together with his wife, Roberta, they thereafter cared for Joseph until custody was changed to the Surbers.

The Smith's home in the country with 9½ acres appears to be perfectly adequate for Joseph's and their needs. Gerry's children and Roberta's were raised there and their fourteen-year-old son, Robert, lives there now. Gerry has a net worth of about $120,000 and has a history of giving financial help to his children. He does not allow alcohol on the grounds, has a flexible temperament and appears to be motivated to love Joseph completely as a member of his family. Gerry's son, Gerry, Jr., and a nearby neighbor testified very favorably that the love and care received by Joseph in the Smith home was very good.

Gerry feels strongly that family traditions are important to be maintained and that Joseph should keep the surname Reed.

Roberta Smith loves Joseph very much and shares her husband's desires and aspirations toward Joseph. She stated that her relationship with her husband was very good.

Our review shows that physical custody of Joseph with Gerry and Roberta Smith was legally appropriate. They are qualified and suitable guardians. We find that Joseph should be in their custody, and they should be appointed guardians for him. We reverse and remand for entry of orders to effect their appointment.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.